Argued and submitted September 9, 1996, peremptory writ to issue
February 21, 1997

STATE OF OREGON ex rel Mark HUDDLESTON,
District Attorney for Jackson County,
*Plaintiff-Relator,*

*v.*

Honorable L. L. SAWYER,
Judge of the Circuit Court of the
State of Oregon for Jackson County,
*Defendant.*

(SC S42938)*

932 P2d 1145

* Relating to Jackson County Circuit Court No. 952538CC2.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for relator. With him on the briefs were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Eleanor E. Wallace, Assistant Attorney General.

Jesse Wm. Barton, Deputy Public Defender, Salem, argued the cause for defendant. With him on the brief was Sally L. Avera, Public Defender.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.

GRABER, J.

Durham, J., filed an opinion concurring in part and dissenting in part.

Fadeley, J., dissented in part and joined in part 2 of Durham, J.'s opinion.

**GRABER, J.**

The facts pertinent to this original mandamus proceeding are not in dispute.

Relator is the District Attorney for Jackson County. Defendant is a judge of the Circuit Court for Jackson County.

Relator represents the State of Oregon in *State v. Bobby Ron Vanzant,* Jackson County Circuit Court Case No. 952538CC2. In that case, Vanzant was charged by indictment with first-degree manslaughter, based on an act that he had committed on June 18, 1995. On October 9, 1995, a jury convicted Vanzant of the lesser-included offense of second-degree manslaughter, in violation of ORS 163.125(1)(a).[1] Defendant was the trial judge and sentencing judge.

ORS 137.700(2)(e) provides that a judge imposing sentence on a person convicted of second-degree manslaughter must order the person to serve at least 75 months in prison.[2] ORS 137.700 is the codification of Measure 11, which was adopted by the people in 1994.[3] Before being sentenced, Vanzant filed a memorandum in which he argued that ORS

---

[1] ORS 163.125(1)(a) provides that criminal homicide is second-degree manslaughter when "[i]t is committed recklessly." Second-degree manslaughter is a Class B felony. ORS 163.125(2). Therefore, the maximum prison sentence allowed by law for the conviction is 10 years. ORS 161.605(2).

[2] ORS 137.700 provides in part:

"(1) When a person is convicted of one of the offenses listed in subsection (2) of this section and the offense was committed on or after April 1, 1995, the court shall impose, and the person shall serve, at least the entire term of imprisonment listed in subsection (2) of this section. The person is not, during the service of the term of imprisonment, eligible for release on post-prison supervision or any form of temporary leave from custody. The person is not eligible for any reduction in the sentence for any reason whatsoever under ORS 421.120, 421.121 or any other statute. The court may impose a greater sentence if otherwise permitted by law, but may not impose a lower sentence than the sentence specified in subsection (2) of this section.

"(2) The offenses to which subsection (1) of this section applies and the applicable mandatory minimum sentences are:

"* * * * *

"(e) Manslaughter in the second degree, as defined in ORS 163.125[:] 75 months."

[3] In this opinion, we use the terms Measure 11 and ORS 137.700 interchangeably.

137.700 is facially unconstitutional for several reasons. Relator filed a response, contending that ORS 137.700 is valid. After a hearing, defendant rejected Vanzant's various challenges to ORS 137.700, but he went on to rule *sua sponte* that the statute is facially unconstitutional under the Equal Protection Clause of the United States Constitution and that the statute is, therefore, unenforceable.

Thereafter, at sentencing, defendant placed Vanzant's conviction into grid block 8-H and imposed a 20-month presumptive sentence under the sentencing guidelines. Over relator's objection, defendant refused to impose the 75-month minimum sentence prescribed by ORS 137.700(2)(e). On December 22, 1995, judgment was entered on the conviction and sentence.

On January 12, 1996, relator filed a petition for an alternative writ of mandamus. This court issued an alternative writ, and the present proceeding ensued.[4] For the reasons that follow, we now direct the issuance of a peremptory writ of mandamus, requiring defendant to enter a corrected judgment in *State v. Bobby Ron Vanzant*, Jackson County Case No. 952538CC2, that imposes sentence for the crime of second-degree manslaughter in accordance with ORS 137.700(2)(e).

## I. APPROPRIATENESS OF MANDAMUS AS A REMEDY

■ Defendant asserts that mandamus is not an appropriate remedy, because the state can appeal from the judgment in the underlying case and thereby has a plain, speedy, and adequate remedy in the ordinary course of the law. *See State ex rel LeVasseur v. Merten*, 297 Or 577, 579-80, 686 P2d 366 (1984) (ordinarily mandamus will not lie if there is a plain, speedy, and adequate remedy in the course of the law).[5]

---

[4] Because Vanzant is the real party in interest, the State Public Defender's Office has appeared on behalf of defendant, pursuant to ORS 34.130(4). Defendant has consented to that appearance, pursuant to ORS 34.130(4) and ORAP 11.10(1).

In this case, as we have said, defendant in fact rejected many of the legal arguments now pursued by the State Public Defender's Office on behalf of the real party in interest, Vanzant. For that reason, we will refer to Vanzant, rather than defendant, as the party who is pressing those claims that defendant rejected in the underlying criminal proceeding.

[5] Under our mandamus jurisprudence, it is the remedy, not the statute creating the remedy, that must be "plain." If a statute, however ambiguous, grants a

Appellate review is governed by statute. *Henry and Henry*, 301 Or 185, 188, 721 P2d 430 (1986). Under ORS 138.060(5), the state has a right to appeal a sentence "as provided in ORS 138.222."

ORS 138.222 provides that appellate courts may not review certain sentences. ORS 138.222(2) provides in part:

"On appeal from a judgment of conviction entered for a felony committed on or after November 1, 1989, the appellate court shall not review:

"(a) Any sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission."

Relator argues that ORS 138.222(2)(a) applies and that it precludes appellate review of the issues presented.

ORS 138.222(2) further provides that "the appellate court shall not review:"

"(e) Except as authorized in subsections (3) and (4) of this section, any other issue related to sentencing."

Subsection (3) relates to departure sentences, which are not involved here. Subsection (4)(a) states that "the appellate court may review a claim that * * * [t]he sentencing court failed to comply with requirements of law in imposing or failing to impose a sentence." Defendant argues that ORS 138.222(4)(a) authorizes review of the state's claims on appeal in *State v. Vanzant*.

The parties' arguments require us to engage in a two-step inquiry. The first step is to determine whether the court is being asked to "review" "[a]ny sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission"—that is, whether ORS 138.222(2)(a) applies. If the answer is "yes," the second step is to determine whether review under ORS 138.222(4)(a) is available nonetheless.

right to an appeal respecting the disputed issue, for example, then the remedy—appeal—ordinarily precludes mandamus. Accordingly, it is our task simply to construe the relevant appellate statute. *Compare* the separate opinion of Durham, J., 324 Or at 631-37.

■ We turn first to the meaning of ORS 138.222(2)(a). ORS 137.651 to 137.671 provide for the establishment and functioning of the Oregon Criminal Justice Commission (Commission), which is referred to in the statute that we are interpreting. The Commission's authority includes rule-making. ORS 137.673. ORS 137.669 provides that the felony sentencing guidelines adopted by the Commission and approved by the legislature

> "shall control the sentences for all crimes committed after the effective date of such guidelines. Except as provided in ORS 137.671, *the incarcerative guidelines* and any other guidelines so designated by the commission shall be mandatory and *constitute presumptive sentences*." (Emphasis added.)

ORS 137.671 provides:

> "(1) The court may impose a sentence outside *the presumptive sentence* or sentence range made presumptive under ORS 137.669 for a specific offense if it finds there are substantial and compelling reasons justifying a deviation from *the presumptive sentence.*

> "(2) Whenever the court imposes a sentence outside *the presumptive sentence* it shall set forth the reasons for its decision in the manner required by rules of the Oregon Criminal Justice Commission." (Emphasis added.)

The statutes do not define the term "presumptive sentence." The Commission has, however, defined that term by rule:

> " 'Presumptive Sentence' means the sentence provided in a grid block for an offender classified in that grid block by the combined effect of the crime seriousness ranking of the current crime of conviction and the offender's criminal history." OAR 253-03-001(16).

> " 'Grid Block' means a box on the grid formed by the intersection of the crime seriousness ranking of a current crime of conviction and an offender's criminal history classification." OAR 253-03-001(10).

> " 'Grid' means the Sentencing Guidelines Grid set forth [as an appendix to the Commission's rules.]" OAR 253-03-001(9).

From the relevant statutes and from the Commission's rules, it is clear that a "presumptive sentence" does *not* mean a statutorily mandated term of imprisonment that does or may apply to a particular conviction. ORS 137.637 provides:

> "When a determinate sentence of imprisonment is required or authorized by statute, the sentence imposed shall be the determinate sentence *or* the sentence as provided by the rules of the Oregon Criminal Justice Commission, whichever is longer." (Emphasis added.)

As explained above, it is only the latter type of sentence, not the former, that can be "the presumptive sentence" as that term is used in the statute. ORS 137.669, ORS 137.671. Echoing the provisions of ORS 137.637, OAR 253-09-001 provides in part:

> "(1) If a mandatory prison sentence is required or authorized by statute, the sentence imposed shall be that determinate sentence or the sentence under these rules whichever is longer.

> "(2) If the provisions of ORS 137.635 [providing mandatory determinate sentences for certain specified felony convictions], require the imprisonment of an offender for whom the grid provides presumptive probation, the offender shall be imprisoned for a duration determined as follows:

> "[listing months of imprisonment for offenses classified in various grid blocks.]"

*See also State v. Jones,* 315 Or 225, 231, 844 P2d 188 (1992) ("a sentence is a 'mandatory minimum sentence' if it is statutorily required").

The felony sentencing guidelines thus contain a means to harmonize potential conflicts between "the presumptive sentence" and a longer, statutorily mandated term of imprisonment. That being so, the enactment or operation of a statutorily mandated term of imprisonment does not erase the applicability of the felony sentencing guidelines as a whole and does not alter the meaning of the term "presumptive sentence," which is expressly defined by rule.

■ Nothing in Measure 11 interferes with that reconciliation of "the presumptive sentence," prescribed by the felony sentencing guidelines, with a statutorily mandated term of imprisonment. For example, ORS 137.700(1) provides that "[t]he court may impose a greater sentence [than the specified minimum] if otherwise permitted by law." With respect to each offense listed in ORS 137.700(2), except murder, the minimum sentence prescribed by ORS 137.700 is significantly less than the maximum sentence already prescribed for that offense by ORS 161.605.[6] Here, for example, the minimum prison sentence prescribed by ORS 137.700(2)(e) for Vanzant's conviction is 75 months, while the maximum prison sentence allowed by law for that conviction is 10 years (120 months), ORS 161.605(2). Although the statutorily mandated term of imprisonment likely will exceed "the presumptive sentence" prescribed by the felony sentencing guidelines in most cases, (1) that will not necessarily be true in all cases and (2) the sentencing court may use the criteria for departure sentences in the guidelines to impose a sentence greater than the statutorily mandated minimum, even when the offense is listed in ORS 137.700(2).

Defendant's argument may be read to suggest that Measure 11 impliedly repealed the sentencing guidelines for all covered crimes, so that it is a legal impossibility to impose a "presumptive sentence" with respect to a Measure 11 crime. We disagree.

"The doctrine of implied repeal of statutes is that when the legislature enacts a subsequent statute which is repugnant to or in conflict with a prior statute, but contains no language expressly repealing the prior statute, the prior statute is impliedly repealed." *State v. Shumway*, 291 Or 153, 160, 630 P2d 796 (1981).

*See also Anthony et al. v. Veatch et al.*, 189 Or 462, 481, 220 P2d 493, 221 P2d 575 (1950) ("If earlier and later statutes are in irreconcilable conflict, then the earlier must yield to the later by implied repeal." (citations omitted)). Repeal by implication is "not favored." *State ex rel Med. Pear Co. v. Fowler*, 207 Or 182, 195, 295 P2d 167 (1956). It must be established

---

[6] With respect to murder, the minimum sentence prescribed by ORS 137.700 is the same as the minimum sentence prescribed by ORS 163.115(5)(b)—25 years.

by " 'plain, unavoidable, and irreconcilable repugnancy.' " *Shumway*, 291 Or at 162 (quoting *Messick v. Duby*, 86 Or 366, 371, 168 P 628 (1917)).

We have explained above how the sentencing guidelines and Measure 11 can be harmonized to give effect to both. In that circumstance, no implied repeal has occurred.

From the text and context of ORS 138.222(2)(a), we conclude that the phrase "[a]ny sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission," found in that statute, refers only to "the sentence provided in a grid block for an offender classified in that grid block by the combined effect of the crime seriousness ranking of the current crime of conviction and the offender's criminal history." OAR 253-03-001(16). By definition, then, "[a]ny sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission" refers to a *specified number of months of incarceration* for a conviction that has been placed in the proper grid block.

Defendant placed Vanzant's conviction into grid block 8-H of the felony sentencing guidelines and imposed a 20-month sentence. It is undisputed that Vanzant's conviction properly falls into grid block 8-H; that "the presumptive sentence" provided for a conviction in grid block 8-H is 19 to 20 months; that the 20-month sentence thereby is "within" that presumptive sentence; and that Vanzant's conviction is subject to the felony sentencing guidelines as well as to ORS 137.700. That being so, Vanzant's sentence of 20 months is a "sentence that is within the presumptive sentence prescribed by" the felony sentencing guidelines, within the meaning of ORS 138.222(2)(a).

The only remaining issue under ORS 138.222(2)(a) is whether relator is seeking appellate "review" of that sentence. What relator calls into question here is the *number of months of incarceration* to which Vanzant has been sentenced, even though his conviction has been placed in the proper grid block. What relator seeks is a different sentence that is not "within the presumptive sentence," for a conviction that has been placed in the proper grid block. Thus, from the text of ORS 138.222(2)(a), relator is seeking "review" of a

"sentence that is within the presumptive sentence prescribed by" the felony sentencing guidelines.

Context supports the foregoing reading. ORS 138.222(3) provides for the limited bases on which a challenge is available "[i]n any appeal from a judgment of conviction imposing a sentence that departs from the presumptive sentence." That section reinforces the conclusion that no such bases are available in an appeal from a judgment of conviction imposing a presumptive sentence. ORS 138.222(4)(b) allows the appellate court to review a claim that "[t]he sentencing court erred in ranking the crime seriousness classification of the current crime or in determining the appropriate classification of a prior conviction or juvenile adjudication for criminal history purposes." That section reinforces the conclusion that appellate review is not available to challenge a presumptive sentence when a conviction is placed in the proper grid block.

If text and context leave any doubt as to the intended scope of the limitation of "review" of a "sentence that is within the presumptive sentence prescribed by" the felony sentencing guidelines, legislative history quiets that doubt. In his statement on the Senate floor, which preceded the passage of the sentencing guidelines bill that included ORS 138.222, Senator Springer explained that the drafters "worked very closely to limit those circumstances in which an appeal may be taken." Tape Recording, Senate Floor Debate, June 15, 1989, Tape 184, Side A. Senator Springer noted that 30 to 35 percent of the Court of Appeals' substantial workload then involved sentencing-related criminal cases and that the drafters intended to be sensitive to that workload. *Ibid.* To that end, "we provide that the court will not review * * * if the sentence is within the presumptive sentence provided by the rules." *Ibid.*

Senator Springer then discussed the other situations in which there would be no review, followed by a discussion of "those areas in which we would permit an appeal." *Ibid.* As to those areas, "the Court of Appeals is going to be looking just at a few issues," none of which included the kind of situation presented here. *Ibid.*

Specifically with regard to the state's right to seek appellate review, Senator Springer said in part:

"And another important measure I want to point out, just in closing on this section, is you'll find that, for the first time, the state is given the opportunity to appeal the sentence if they feel that the judge has made an error in finding, perhaps a mitigation or departure with which the state may disagree." *Ibid.*

There is nothing in the legislative history to suggest that the state could appeal a presumptive sentence in any circumstance.

The purpose of ORS 138.222, as revealed in the legislative history, was to curtail appellate review and reduce the number of appeals. With respect to those cases in which the trial court imposed a presumptive sentence on a conviction that was placed in the proper grid block, the stated intention was that appellate review would not be available. There was no suggestion that the reason for imposing the presumptive sentence, or the reason for *not* imposing a different (higher or lower) sentence, would matter.

After examining text, context, and legislative history, we conclude that relator is seeking "review" of Vanzant's sentence, which is a "sentence that is within the presumptive sentence prescribed by" the felony sentencing guidelines. Accordingly, the limitation on appellate review contained in ORS 138.222(2)(a) applies. We therefore turn to the second step of the inquiry: whether ORS 138.222(4)(a) nonetheless permits review of the issues presented.

In *State v. Adams*, 315 Or 359, 365-67, 847 P2d 397 (1993), this court held that *"ORS 138.222(3) and (4) are exceptions only to ORS 138.222(2)(e)"* but not to ORS 138.222(2)(a) to (d). (Emphasis added.) The court based that holding primarily on the wording, context, and structure of the statute. *Ibid.* As we have concluded, relator's petition asks for review of the number of months of incarceration to which Vanzant has been sentenced under the presumptive-sentence portion of the felony sentencing guidelines, which is the precise subject covered by ORS 138.222(2)(a), not an "other" issue covered by ORS 138.222(2)(e). That being so, ORS 138.222(4)(a) is not available.

In response to that line of reasoning, defendant argues, first, that a criminal defendant could challenge on direct appeal a decision to impose a Measure 11 sentence as

being unconstitutional. For example, had defendant imposed a 75-month sentence instead of a 20-month sentence, he asserts, Vanzant could have appealed and had his constitutional claims reviewed. That proposition is correct, because such a sentence is *not* a presumptive sentence as to which ORS 138.222(2)(a) precludes appellate review. However, that proposition does not demonstrate that appellate review is available when a court imposes a lesser, presumptive sentence. The fact that a statute may grant a comparative advantage to criminal defendants does not detract from the statute's clear meaning.

Defendant next points out that the state filed a notice of appeal in *State v. Vanzant*. That is so, but a litigant's prudence proves nothing about the meaning of the statutes governing appellate review.

Finally, defendant contends that *Adams* does not apply, because the criminal defendant in *Adams* had stipulated to a departure sentence, whereas "Vanzant stipulated to nothing." (Boldface deleted.) Defendant misses the key point of *Adams*. It is true that *Adams* concerned unreviewability under ORS 138.222(2)(d), governing stipulated sentences, while the present case concerns unreviewability under ORS 138.222(2)(a), governing presumptive sentences. Nonetheless, the central underpinning of this court's holding in *Adams* was that the exceptions found in subsections (3) and (4) of ORS 138.122 "are exceptions only to ORS 138.222(2)(e)" but not to the enumerated situations found in ORS 138.222(2)(a) to (d). *Adams*, 315 Or at 365-67. When this court interprets a statute, that interpretation becomes a part of the statute as if written therein. *State v. King*, 316 Or 437, 445, 852 P2d 190 (1993).[7] That principle applies even when the statute operates in a new factual setting.

In summary, relator has no plain, speedy, and adequate remedy in the ordinary course of the law. We exercise our discretion to proceed in mandamus.

---

[7] There are sound prudential reasons for following the principle stated in the text. Among them are a need for stability and certainty in the understanding of statutes and a respect for the interplay between the roles of the legislative and judicial branches of government in the context of statutory interpretation.

## II. STATE CONSTITUTIONAL CLAIMS

We first address state constitutional claims. *See State v. Charboneau*, 323 Or 38, 53, 913 P2d 308 (1996) (court addresses state constitutional claims before addressing federal constitutional claims). Vanzant asserts that Measure 11 violates the equal privileges and immunities clause of Article I, section 20, of the Oregon Constitution; the right of allocution under Article I, section 11; the reformation clause of Article I, section 15; and the separation-of-powers principles set forth in Article III, section 1, and Article VII (Amended), section 1.

### A. *Equal Privileges and Immunities*

Article I, section 20, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

Vanzant argues:

"Measure 11 creates two subclasses: offenders whose Measure 11 minimums are greater than their presumptive maximum guidelines sentences, and offenders whose Measure 11 minimums are less than their presumptive maximums. Trial courts cannot mitigate the sentences of members of the former subclass, but they can mitigate (at least to a degree) the sentences of members of the latter class. Measure 11 disfavors members of the former class, and there is nothing those members can do to gain entry into the favored class. The measure thereby violates the disfavored members' rights of equal privileges and immunities."

The groups to which Vanzant alludes do not comprise "class[es] of citizens" within the meaning of Article I, section 20. In *State v. Clark*, 291 Or 231, 630 P2d 810, *cert den* 454 US 1084 (1981), this court discussed the meaning of the constitutional phrase "class of citizens" in Article I, section 20:

"The terms 'class' and 'classification' are invoked sometimes to mean whatever distinction is created by the challenged law itself * * *. [E]very law itself can be said to 'classify' what it covers from what it excludes. For instance, the rule of this court that limits the time for filing a petition

for review (Rule 10.05) 'classifies' persons by offering the 'privilege' of review to those who file within 30 days and denying it to those who file later. Similarly, a law that licenses opticians and optometrists to perform different functions does not grant or deny privileges to classes of persons whose characteristics are those of 'opticians' and 'optometrists'; rather, the law creates these classes by the licensing scheme itself. Attacks on such laws as 'class legislation' therefore tend to be circular and * * * have generally been rejected whenever the law leaves it open to anyone to bring himself or herself within the favored class on equal terms." 291 Or at 240-41 (citation omitted).

Laws involving classifications created by statute "are entitled to no special protection and, in fact, are not even considered to be classes for the purposes of Article I, section 20." *Sealey v. Hicks*, 309 Or 387, 397, 788 P2d 435, *cert den* 498 US 819 (1990).

Measure 11 is a law that involves classifications created by statute. Indeed, Vanzant acknowledges that persons subject to sentencing under Measure 11 "are not members of a 'true class,' for Article I, section 20[,] purposes."

Measure 11 mandates the same minimum sentence for everyone who commits a particular crime. The fact that some such persons have committed crimes in the past that place them in a position under the felony sentencing guidelines that is less favorable than the position that they occupy under Measure 11 does not create "classes" for Article I, section 20, purposes.[8] A criminal defendant is responsible not only for having committed the crime that calls Measure 11 into play, but also for having accumulated a prior criminal history. In other words, every person had the opportunity to remain in the allegedly favored class by obeying the law. Thus, the classification on which Vanzant relies is not based on factors beyond the criminal defendant's control. Neither is

---

[8] *See Moore v. Missouri*, 159 US 673, 678, 16 S Ct 179, 40 L Ed 301 (1895) (under the federal Equal Protection Clause, "the State may undoubtedly provide that persons who have been before convicted of crime may suffer severer punishment for subsequent offences than for a first offence against the law, and * * * a different punishment for the same offence may be inflicted under particular circumstances, provided it is dealt out to all alike who are similarly situated" (citations omitted)).

that classification based on an immutable characteristic, such as race.

We conclude that the challenge under Article I, section 20, is not well taken.

## B. *Allocution*

■ Article I, section 11, of the Oregon Constitution, states in part that, "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel." That right includes the right to speak at sentencing, that is, the right of allocution. *DeAngelo v. Schiedler*, 306 Or 91, 94-96, 757 P2d 1355 (1988). Vanzant argues:

> "[The right of allocution] requires that at sentencing, defendants be given a meaningful way to seek mitigation of their sentences. However, a defendant such as Vanzant, whose Measure 11 minimum is greater than his presumptive maximum guidelines sentence, has no meaningful way to seek mitigation. The measure violates his right of allocution."

Vanzant misunderstands the nature and extent of the right of allocution. That right does not carry with it a right to have the sentencing court *necessarily* be able to reduce a sentence that otherwise applies. Rather, in *DeAngelo*, this court noted that the right "should logically include the right to make any statements relevant to *existing sentencing* and parole *practices*." 306 Or at 95 (emphasis added). That is not the same as a right to alter or to abate existing sentencing practices.[9]

Vanzant also is wrong to suggest that the right of allocution is meaningless for a person being sentenced under ORS 137.700. First, that statute prescribes imposition of a minimum sentence for certain felonies. Thus, a trial court could impose an even longer sentence than the minimum.[10]

---

[9] *See* Note, *Procedural Due Process at Judicial Sentencing for Felony*, 81 Harv L Rev 821, 832-33 (1968) ("since the common law judge generally had no discretion as to the quantum of punishment in felony cases, the point of [allocution] was not to elicit mitigating evidence or a plea for leniency, but to give the defendant a formal opportunity to present one of the strictly defined legal reasons which required the avoidance or delay of sentencing: he was not the person convicted, he had benefit of clergy or a pardon, he was insane, or if a woman, she was pregnant" (footnotes omitted)).

[10] As previously stated, ORS 137.700(1) provides that "[t]he court may impose a greater sentence if otherwise permitted by law." The felony sentencing guidelines

The right of allocution gives a defendant an opportunity to attempt to convince the sentencing court to impose no more than the minimum, as well as to address other sentencing matters that may be involved, such as the imposition of a fine.

Second, the present case involves only a facial challenge to ORS 137.700. During allocution a defendant may argue that the mandatory minimum, *as applied to the particular crime*, would be unconstitutionally cruel and unusual or disproportionate.[11] That, too, is a meaningful use of allocution that remains available under ORS 137.700.

In summary, the challenge under Article I, section 11, is not well taken.

C. *Reformation*

■ At the time of the underlying crime, Article I, section 15, of the Oregon Constitution, provided:

"Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice."[12]

Vanzant argues that the foregoing provision

"requires that either the judiciary or the executive have the authority to structure sentences in accordance with an offender's reformation. Measure 11—a statute—prohibits such structuring (indeed, it does not even allow the executive to give offenders time off for good behavior). Measure 11 thereby violates Article I, section 15."

As noted above, ORS 137.700 establishes minimum terms of imprisonment for convictions of specific felonies. More than 30 years ago, this court rejected an Article I, section 15, challenge to a similar statute. In *Tuel v. Gladden*, 234 Or 1, 3, 379 P2d 553 (1963), the convicted person had been sentenced to life in prison, under a habitual-offender

---

permit upward departures in some circumstances, and the sentencing court also may impose consecutive sentences under ORS 137.123.

[11] Vanzant did not make either claim in the underlying case.

[12] At the election of November 5, 1996, the people amended Article I, section 15, of the Oregon Constitution, by adopting Measure 26 (1996). Because of our disposition of this case, we need not and do not consider any question related to Measure 26.

statute. This court held that the sentence mandated by that statute did not violate Article I, section 15, reasoning:

> "The Oregon Constitution does not attempt to state all of the principles to be followed by the legislature in enacting sentencing laws. The constitution does contain sentencing restrictions in addition to the above quoted [reformation clause]. It requires that 'all penalties shall be proportioned to the offenses'; excessive fines shall not be imposed; and cruel and unusual punishments shall not be inflicted. Art I, § 16. The drafters of the constitution, however, did not include the most important consideration of all, the protection and safety of the people of the state. Such a principle does not have to be expressed in the constitution as it is the reason for criminal law. All jurisdictions recognize its overriding importance.
>
> "We interpret Art I, § 15, of the Oregon Bill of Rights to command and require that Oregon sentencing laws have as their object reformation and not retaliation, but they do not require that reformation be sought at substantial risk to the people of the state." *Id.* at 5-6 (footnote omitted).

Vanzant asserts that *Tuel* is distinguishable, because it involved application of a habitual-offender statute, which by definition took account of a convicted person's criminal history and, implicitly, resistance to reformation. But the rationale of *Tuel*, quoted above, is more general than Vanzant suggests. Under that rationale, the legislature is entitled to prescribe more serious penalties for crimes that present greater risks to the safety of the people of the state. Nothing in *Tuel* suggests that the choice of a sentence must differ from criminal to criminal because of Article I, section 15. To the contrary, its very holding supports the imposition of a lengthy mandatory sentence for all persons coming within the ambit of the sentencing statute.

Vanzant's assertions that Article I, section 15, requires that all sentences be capable of individualized "structuring," and that ORS 137.700 violates that provision by not providing it, are not well taken.

D. *Separation of Powers*

Article III, section 1, of the Oregon Constitution, provides:

"The powers of the Government shall be divided into three seperate (sic) departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Article VII (Amended), section 1, provides in part:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

Vanzant makes four separate points, which we will consider in turn.

■ First, he argues:

"a. To the extent Measure 11 minimums prohibit mitigation, it encroaches on the judicial function of preserving offenders' constitutional rights against cruel and unusual punishments, and of allocution and reformation."

We have discussed the issues of allocution and reformation earlier in this opinion. Additionally, ORS 137.700 does not encroach on the judicial ability to protect a convicted person's constitutional right to be free from cruel and unusual punishment. As explained above, if a sentencing court rules that a statutorily prescribed sentence (under ORS 137.700 or any other statute) would be unconstitutionally cruel and unusual *as applied in a given case*, the court may refuse to impose the prescribed sentence. Nothing in ORS 137.700 interferes with the performance of that judicial function. Conversely, nothing in the statute requires another branch of government to perform any functions that it was not performing before the enactment of the statute.

■ Next, Vanzant argues:

"b. Historically, the power to ascertain appropriate sentences has been shared by the legislative, executive, and judicial branches; thus, the judiciary has an inherent sentencing power. To the extent Measure 11 prohibits mitigation, it reduces sentencing judges to mere scriveners—functionaries who merely pencil in legislatively predetermined sentences. Thus, the measure eviscerates the judiciary's inherent (historically shared) sentencing powers."

The inherent sentencing power of the courts, whatever its precise reach may be, does not go as far as that argument suggests. Determining the range of possible sentences for particular crimes historically has been a legislative, rather than a judicial, function. As this court said in *State v. Smith*, 128 Or 515, 524, 273 P 323 (1929), the "power to declare what punishment may be assessed against those convicted of crime is not a judicial, but a legislative, power."[13]

This court has held that courts have inherent power to structure sentences in certain respects. For example, in *State v. Jones*, 250 Or 59, 61, 440 P2d 371 (1968), this court held that the judiciary had inherent power to decide whether sentences should be served consecutively or concurrently. That proposition does not carry with it, however, a corollary inherent power to negate or disregard statutorily prescribed sentences. To the contrary, this court has held that courts need specific statutory authority to impose a sentence of imprisonment.[14] In *Howell v. State of Oregon*, 1 Or 241, 245 (1859), this court held that, when a statute limited solitary confinement to a maximum of 20 days, the court had no power to sentence the defendant to a year of solitary confinement. More recently, in *State v. Leathers*, 271 Or 236, 240, 531 P2d 901 (1975), this court emphasized that,

> "[w]hen a court acts beyond the bounds of its sentencing authority, it infringes upon the power of the legislature to determine the manner of punishment. A sentence must be in conformity with the governing statute; any non-conforming sentence is void for lack of authority and thus totally without legal effect." (Citations omitted.)

Vanzant's third contention is the following:

> "c. The charge which the district attorney (DA) selects sets the sentence for a Measure 11 offender. Neither the judiciary nor the executive has the authority to review that sentencing selection. Thus, Measure 11 impermissibly delegates plenary sentencing authority to the DA."

---

[13] A somewhat different principle applies when the punishment is for contempt of court. *See State ex rel Oregon State Bar v. Lenske*, 243 Or 477, 492-93, 405 P2d 510, 407 P2d 250 (1965) (legislature may not destroy or unreasonably abridge court's inherent power to punish for contempt), *cert den* 384 US 943 (1966).

[14] *But see* note 13, above.

ORS 137.700 establishes minimum prison sentences for 18 felonies. Although the statute does decrease the amount of discretion that a judge may exercise in sentencing a person convicted of a covered crime,[15] it does not transfer any of the former discretion to prosecutors. When making a charging decision, a prosecutor always has known what the legislative range of sentencing is and what statutory minimum sentence (if any) applies. ORS 137.700 has done nothing to change that fact, other than to establish some additional statutory minimum sentences for particular crimes. In other words, the prosecutor's charge always has "set" the sentence in the sense that the charge carries with it a specified, legislatively determined punishment. (Indeed, were it otherwise, serious constitutional questions would arise because, unless the prosecutor can know what potential punishment a given charge carries, the accused person would not be able to determine it, either.)

Moreover, it is the *conviction* of a crime—a judicial event—and not the mere charge, that requires imposition of a Measure 11 sentence. It is a judge, not a prosecutor, who imposes it.

 Vanzant's fourth and last separation-of-powers argument is this:

"d. Measure 11 orders the executive not to reduce sentences in any way. However, Article I, section 15 requires the executive to shorten sentences in response [to] offenders' reformation. Thus, the measure impermissibly prescribes duties which conflict with the executive's constitutional powers."

Vanzant appears to be arguing either that Measure 11 is the legislative performance of an executive function or that Measure 11 unduly burdens the exercise of an executive function. Neither variant of the argument is persuasive.

In *State ex rel Frohnmayer v. Oregon State Bar*, 307 Or 304, 310, 767 P2d 893 (1989), this court held that a violation of Article III, section 1, occurs when "the powers or functions of one governmental branch are performed by a person

---

[15] As discussed above, a judge retains discretion to impose more than the minimum and to impose consecutive sentences.

performing the duties of a different branch." In that case, the court held that application of the public records law to the disciplinary files of the Oregon State Bar did not violate the state constitutional doctrine of separation of powers. The court noted that "the exercise of power constitutionally assigned to one branch will often have a direct impact on another branch of government" and that such an impact does not, itself, violate the constitution. *Ibid.*

As discussed above, the selection of a range of sentences for the crimes specified in ORS 137.700 is a power constitutionally assigned to the legislative branch. It is not an executive function.

Instead, the function of the executive is to "take care that the Laws be faithfully executed." Or Const, Art V, § 10. Further, as discussed above, Article I, section 15, does not confer on the executive branch the discretion to reduce the length of criminal sentences.

We turn now to the second variant of Vanzant's separation-of-powers argument and consider whether one branch of government has unduly burdened the actions of another. *See Rooney v. Kulongoski (Elections Division #13)*, 322 Or 15, 28, 902 P2d 1143 (1995) (stating issue). The underlying problem that the "undue burden" cases address is "avoid[ing] the potential for coercive influence between governmental departments." *Ibid.* Measure 11 does not coerce the exercise of executive-branch functions. As previously discussed, Article I, section 15, does not confer on the executive the power to reduce the length of criminal sentences.

In conclusion, none of Vanzant's arguments concerning separation of powers persuades us of an infirmity in ORS 137.700.

### III. FEDERAL CONSTITUTIONAL CLAIMS

Because none of the state constitutional challenges succeeds, we turn to the federal constitutional challenges.

### A. *Guarantee Clause*

■ The first of the federal constitutional claims is that the initiative process by which the voters adopted Measure 11, and the content of a companion measure, violate the

Guarantee Clause of Article IV, section 4, of the United States Constitution.[16] Because we conclude that Vanzant's Guarantee Clause claim is not justiciable, we do not reach the merits of that claim.[17]

Both the United States Supreme Court and this court have held that claims arising under the Guarantee Clause do not present justiciable controversies. *See Pacific Telephone Co. v. Oregon*, 223 US 118, 149-51, 32 S Ct 224, 56 L Ed 377 (1912) (so holding); *Baum v. Newbry et al.*, 200 Or 576, 583-85, 267 P2d 220 (1954) (applying *Pacific Telephone* and so holding). In *Pacific Telephone*, an Oregon taxpayer challenged an Oregon state tax levied against it, on the theory that that tax, which had been enacted through an initiative petition pursuant to Article IV, section 1 (1902), of the Oregon Constitution, was unconstitutional. The United States Supreme Court described the taxpayer's argument, and the issues before it in that case, this way:

> "[The taxpayer's arguments] are all based upon the single contention that the creation by a State of the power to legislate by the initiative and referendum causes the prior lawful state government to be bereft of its lawful character as the result of the provisions of [the Guarantee Clause]. This being the basis of all the contentions, the case comes to the single issue whether the enforcement of that provision,

---

[16] Article IV, section 4, of the United States Constitution, provides in part:

"The United States shall guarantee to every State in this Union a Republican Form of Government * * *."

[17] On the merits, Vanzant asserts that Measure 11 violates the Guarantee Clause

"in two interrelated ways.

"a. The measure's history—principally, the proponents' statements in the *Voters' Pamphlet*—is so replete with inaccuracies that it short-circuited the deliberative process. Rather than mediate majoritarian passion for the measure, the inaccuracies inflamed it. Under the [Guarantee] Clause, such a failure of the deliberative process is fatal.

"b. Measure 11 is affirmative legislation, for it requires the judiciary to impose, and the executive to administer, particular sentences. Owing to the guardian-ward relationship between Measure 10's veto-proof supermajority requirement, and Measure 11's minimum sentences, the legislature cannot readily amend Measure 11, as it can most every other type of statute. Because Measure 11 is affirmative legislation which the legislature cannot amend 'at will,' it violates the [Guarantee] Clause test which this court announced in *Kadderly v. Portland*[, 44 Or 118, 74 P 710, 75 P 222 (1904)]."

because of its political character, is exclusively committed to Congress or is judicial in its character." *Pacific Telephone*, 223 US at 137.

The Court held that Guarantee Clause challenges were not justiciable. It stated:

> "As the issues presented, in their very essence, are, and have long since by this court been, definitely determined to be political and governmental, and embraced within the scope of the powers conferred upon Congress, and not therefore within the reach of judicial power, it follows that the case presented is not within our jurisdiction, and the writ of error must therefore be, and it is, dismissed for want of jurisdiction." *Id.* at 151.[18]

Since its decision in *Pacific Telephone*, the Supreme Court has not swayed from that holding and has, in fact, repeatedly reiterated it. *See, e.g., Kiernan v. Portland, Ore.*, 223 US 151, 163-64, 32 S Ct 231, 56 L Ed 386 (1912) (applying *Pacific Telephone* and holding that a Guarantee Clause claim presents a nonjusticiable controversy); *Marshall v. Dye*, 231 US 250, 256-57, 34 S Ct 92, 58 L Ed 206 (1913) (the plaintiffs' Guarantee Clause claim "presents no justiciable controversy concerning which the decision is reviewable in this court upon writ of error to the state court"); *Davis v. Ohio*, 241 US 565, 569, 36 S Ct 708, 60 L Ed 1172 (1916) ("the proposition and the argument [that including the referendum within the state legislative power violates the Guarantee Clause] disregard the settled rule that the question of whether that guarantee of the Constitution has been disregarded presents no justiciable controversy"); *Ohio v. Akron Park District*, 281 US 74, 79-80, 50 S Ct 228, 74 L Ed 710 (1930) ("it is well settled that the questions arising under [the Guarantee Clause] are political, not judicial, in character and thus are for the consideration of the Congress and not the courts"); *Highland Farms Dairy v. Agnew*, 300 US 608, 612,

---

[18] *Minor v. Happersett*, 88 US (21 Wall) 162, 22 L Ed 627 (1874), and *In re Duncan*, 139 US 449, 461, 11 S Ct 573, 35 L Ed 219 (1891), which the separate opinion of Durham, J., cites, 324 Or at 646, 650, predated *Pacific Telephone* by decades and are less specific to the present issue than is *Pacific Telephone*. Therefore, *Minor* and *Duncan* are not binding. *The Federalist No. 10* (James Madison) (B.F. Wright ed, 1961), entitled *The Size and Variety of the Union as a Check on Faction*, 324 Or at 647-49, materials likewise cannot overcome binding Supreme Court precedent.

57 S Ct 549, 81 L Ed 835 (1937) ("the enforcement of [the Guarantee Clause], according to the settled doctrine, is for Congress, not the courts"); *Baker v. Carr*, 369 US 186, 224, 82 S Ct 691, 7 L Ed 2d 663 (1962) ("the Court has consistently held that a challenge to state action based on the [Guarantee] Clause presents no justiciable question"); *City of Rome v. United States*, 446 US 156, 182 n 17, 100 S Ct 1548, 64 L Ed 2d 119 (1980) ("[w]e do not reach the merits of the appellants' argument that the Act violates the Guarantee Clause * * * since that issue is not justiciable").

Because this is a question of federal law, we are bound by the pertinent decisions of the United States Supreme Court. *See Barcik v. Kubiaczyk*, 321 Or 174, 183-86, 895 P2d 765 (1995) (federal standards of justiciability apply to a federal claim under 42 USC § 1983, even when the claim is brought in state court). In *Baum*, this court applied *Pacific Telephone* and its progeny and refused to reach the merits of the plaintiff's argument that an amendment to the state constitution violated the Guarantee Clause by improperly delegating legislative powers to the courts and the executive. This court stated:

> "As to the alleged delegation of legislative authority to the secretary of state, it is well settled that it is not within the judicial power to determine whether the republican form of government as guaranteed by the federal constitution is violated because that question is peculiarly a political matter and not one of judicial cognizance.
>
> "* * * * *
>
> "We are bound by the interpretation placed on the Federal Constitution by the Supreme Court of the United States. This, therefore, being a political matter and not one for judicial inquiry, we are powerless to determine whether or not the constitutional amendment before us violates article IV, § 4, of the Federal Constitution." *Baum*, 200 Or at 584-85.

Vanzant argues that the Supreme Court's cases hold only that Guarantee Clause claims are not justiciable in *federal* courts. He contends that nothing contained in *Pacific Telephone* or its progeny precludes *state* courts from considering claims brought under the Guarantee Clause. Thus,

Vanzant asserts that *Baum* was wrongly decided.[19] For the following three reasons, we disagree.

First, in *Pacific Telephone*, the Supreme Court did not distinguish between state and federal courts when it held that Guarantee Clause claims were not justiciable. The Court framed the question before it as "whether the enforcement of that provision, because of its political character, *is exclusively committed to Congress* or is *judicial in its character.*" 223 US at 137 (emphasis added). *See also id.* at 133 (stating that the issue in the case is "whether it is the duty of *the courts or the province of Congress* to determine when a State has ceased to be republican in form and to enforce the guarantee of the Constitution on that subject" (emphasis added)). The Court specifically held that the Guarantee Clause issues

---

[19] Vanzant relies on the following passage from this court's opinion in *State v. Montez*, 309 Or 564, 603-04, 789 P2d 1352 (1990):

"The United States Supreme Court has provided no practical guidance as to what constitutes a 'republican form of government,' because that Court has held that, within the federal government, the enforcement of the guarantee is assigned not to the federal courts but to the political branches. Thus, claims arising under Article IV, section 4, do not present justiciable controversies *in federal courts.*

*"That does not mean that the states may not adjudicate the compatibility of state law with the guarantee clause.* This court addressed that issue with regard to Oregon's initiative system in *Kadderly v. Portland,* 44 Or 118, 144-45, 74 P 710, 75 P 222 (1903) (initiative and referendum does not abolish or destroy the republican form of government, or substitute another in its place). *See Kiernan v. Portland,* 57 Or 454, 469-80, 111 P 379, 112 P 402 (1910); *Oregon v. Pacific States Tel. & Tel. Co.,* 53 Or 162, 166, 99 P 427 (1909)." (Emphasis added; citation omitted; footnote omitted.)

Vanzant's reliance on that passage in *Montez* is misplaced for three reasons. First, that statement is *dictum*, because it was not necessary to the outcome of the case. Second, that passage is not a complete assessment of the state of the law at that time. In *Montez*, the court cited *Kadderly, Kiernan,* and this court's decision in *Pacific Telephone* to support its statement that Guarantee Clause claims might be justiciable in this court. All those cases were decided before the Supreme Court declared, in *Pacific Telephone,* that Guarantee Clause claims were not justiciable. In *Montez*, the court failed to cite or acknowledge the holding in *Baum*, the only case from this court issued after the Supreme Court's decision in *Pacific Telephone,* which is directly on point. The third reason why defendant's reliance on *Montez* is misplaced is that, if the United States Supreme Court has held squarely that Guarantee Clause claims are not justiciable in state and federal courts, then we lack the authority to determine that such claims are justiciable in state courts. *See Oregon v. Hass,* 420 US 714, 719 n 4, 95 S Ct 1215, 43 L Ed 2d 570 (1975) (state courts may not interpret a provision of the federal constitution to give individuals more rights than have been given under an interpretation of the same provision by the United States Supreme Court). We read the Supreme Court's pertinent cases as so holding.

presented in *Pacific Telephone*, "in their very essence, are \* \* \* *definitely determined to be political and governmental, and embraced within the scope of the powers conferred upon Congress*, and not therefore within the reach of *judicial* power." *Id.* at 151 (emphasis added). That holding is written broadly and is not limited, by its wording, to federal courts. Moreover, the Court's conclusion that the issue presented in *Pacific Telephone* is one "exclusively committed to Congress" forecloses the argument that the issue is one that also may be considered by state courts; if the question is one *exclusively* committed to Congress' judgment, then it is not a proper subject for either state or federal courts.

The second reason why we disagree with Vanzant's argument that Guarantee Clause claims are justiciable in state courts, although not in federal courts, is that the United States Supreme Court has twice *affirmed* state Supreme Court decisions that have held that Guarantee Clause claims do not present justiciable controversies in *state* courts. In *State v. Mountain Timber Co.*, 75 Wash 581, 590, 135 P 645, 649 (1913), *aff'd* 243 US 219, 37 S Ct 260, 61 L Ed 685 (1917), the Washington Supreme Court refused to consider a Guarantee Clause challenge to a state insurance law, reasoning:

> "The contention that the Industrial Insurance Law is in violation of the guarantee of a republican form of government needs no discussion. It is disposed of by reference to the late cases. *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 32 Sup. Ct. 224, 56 L. Ed. 377; *Kiernan v. Portland*, 223 U.S. 151, 32 Sup. Ct. 231, 56 L. Ed. 386."

The Washington court relied on the Supreme Court's holdings in *Pacific Telephone* and *Kiernan*—that Guarantee Clause claims were nonjusticiable—to dispose of the Guarantee Clause claim before it. *Mountain Timber* was appealed to the Supreme Court, which similarly concluded that the Guarantee Clause claims raised in that case were nonjusticiable, citing both *Pacific Telephone* and *Kiernan*. *Mountain Timber*, 243 US at 234-35. Accordingly, that Court affirmed the judgment of the Washington Supreme Court, *id.* at 246, including the part of its opinion that concluded that Guarantee Clause claims are not justiciable in state courts.

Similarly, in *Borden v. Louisiana State Board of Education*, 168 La 1005, 1023, 123 So 655, 661 (1928), the Louisiana Supreme Court relied on *Pacific Telephone* to conclude that a Guarantee Clause claim brought in that case presented a "question [that] is a political one, which does not fall within the jurisdiction of the courts." Therefore, the Louisiana court refused to consider the merits of that claim. The Louisiana court relied on *Borden* when it issued its decision in *Cochran v. Louisiana State Board of Education*, 168 La 1030, 1032-33, 123 So 664 (1928), *aff'd* 281 US 370, 50 S Ct 335, 74 L Ed 913 (1930). The United States Supreme Court affirmed the *Cochran* decision. *Cochran*, 281 US at 375. In doing so, it acknowledged that the Louisiana court's decision in *Borden* was the basis for *Cochran. Id.* at 374. Accordingly, when the Supreme Court stated, in *Cochran*, that Guarantee Clause claims present nonjusticiable controversies and affirmed the judgment of the Louisiana court, *ibid.*, the Court affirmed the Louisiana court's holding that Guarantee Clause claims are not justiciable in state courts.

The third reason why we disagree with Vanzant's argument that Guarantee Clause claims are justiciable in state courts, even though they are not justiciable in federal courts, is that such a conclusion would run afoul of the principle that the Supreme Court is the final arbiter of the federal constitution and that it sits, in part, to ensure that the state courts interpret federal law uniformly. *See Martin v. Hunter*, 14 US (1 Wheat) 304, 348, 4 L Ed 97 (1816) ("Judges of equal learning and integrity, in different states, might differently interpret * * * the constitution itself: if there were no revising authority to control these jarring and discordant judgments, and harmonize them into uniformity, * * * the constitution of the United States would be different, in different states, and might, perhaps, never have precisely the same construction, obligation or efficiency, in any two states. The public mischiefs that would attend such a state of things would be truly deplorable; * * * and the appellate jurisdiction must continue to be the only adequate remedy for such evils."). Under Vanzant's construct, each state would be free to interpret the Guarantee Clause in a different way, but the Supreme Court would be without power to ensure the uniform interpretation of that provision of the federal constitution. *See also Oregon*

*v. Hass*, 420 US 714, 719 n 4, 95 S Ct 1215, 43 L Ed 2d 570 (1975) (state courts may not interpret a provision of the federal constitution to give individuals more rights than have been given under an interpretation of the same provision by the United States Supreme Court).

Vanzant points to numerous law review articles to support his assertion that Guarantee Clause claims are justiciable in state courts, notwithstanding *Pacific Telephone* and *Baum*. For the reasons that follow, we are not persuaded by those articles.

First, many of the commentators who have written on the justiciability of Guarantee Clause claims argue only that such claims *should* be justiciable, not that they *are* justiciable.[20] While that certainly is a valid exercise for a scholar, this court is not free to reject binding precedent from the United States Supreme Court on a question of federal law.

Other commentators assume, without detailed analysis, that state courts may decide Guarantee Clause claims.[21] The absence of analysis makes those commentators unpersuasive.

---

[20] *See* Cynthia L. Fountaine, Note, *Lousy Lawmaking: Questioning the Desirability and Constitutionality of Legislating by Initiative*, 61 S Cal L Rev 733, 761 (1988) (so arguing); Douglas H. Hsiao, Note, *Invisible Cities: The Constitutional Status of Direct Democracy in a Democratic Republic*, 41 Duke LJ 1267, 1291-96 (1992) (same).

[21] *See* Jesse H. Choper, *Observations on the Guarantee Clause—As Thoughtfully Addressed by Justice Linde and Professor Eule*, 65 U Colo L Rev 741, 743 (1994) (accepting, without discussing, that Guarantee Clause claims are justiciable in state courts); Hans A. Linde, *Who is Responsible for Republican Government?*, 65 U Colo L Rev 709, 714 (1994) (concluding, in a paragraph, that the Supreme Court's decision in *Pacific Telephone* does not preclude state courts from considering Guarantee Clause claims); Thomas C. Berg, Comment, *The Guarantee of Republican Government: Proposals for Judicial Review*, 54 U Chi L Rev 208, 225 (1987) (concluding, in a sentence, that Guarantee Clause claims are justiciable in state courts); Debra F. Salz, Note, *Discrimination-Prone Initiatives and the Guarantee Clause: A Role for the Supreme Court*, 62 Geo Wash L Rev 100, 112 (1993) (same); Arthur E. Bonfield, *The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude*, 46 Minn L Rev 513, 554 n 180 (1962) (stating that, even if *Pacific Telephone* bars federal courts from enforcing the Guarantee Clause, it does not prohibit state courts from doing so, because the Supreme Court does not control state court jurisdiction); Laurence H. Tribe, *American Constitutional Law* § 5-23, at 398 (2d ed 1988) (noting that, although the Guarantee Clause does not protect individuals, it may confer "judicially enforceable rights upon *states as states*" (emphasis in original)).

The commentators who do consider the question in detail and who conclude that Guarantee Clause claims are justiciable in state courts base their conclusion on the theory that the United States Supreme Court does not impose its federal constitutional justiciability requirements on state courts, even when state courts address federal questions.[22] Those commentators do not, however, address the impact of the Supreme Court's holdings in *Cochran* or *Mountain Timber*, nor do they adequately distinguish the Supreme Court's broad pronouncement in *Pacific Telephone*, 223 US at 137, that Guarantee Clause claims of the type raised here are "exclusively committed to Congress." In the light of our foregoing discussion, we do not find the arguments of the commentators convincing.

Finally, Vanzant also argues that, even assuming that the Supreme Court's cases have held that Guarantee Clause claims are not justiciable in state courts, recent statements from that Court suggest a retreat from that position. In support of his argument, he points to a passage in *New York v. United States*, 505 US 144, 112 S Ct 2408, 120 L Ed 2d 120 (1992).

In *New York*, the Court held that certain provisions of a federal law dealing with the disposal of low-level radioactive waste violated the federal constitution. 505 US at 149. The Court rejected a Guarantee Clause claim raised by the party challenging the statute. *Id.* at 183-86. The Court stated that it need not decide whether Guarantee Clause claims raise justiciable controversies, because the challenged law in that case could not "reasonably be said to deny any State a

---

[22] *See* Erwin Chemerinsky, *Cases Under the Guarantee Clause Should Be Justiciable*, 65 U Colo L Rev 849, 873-74 (1994) (so arguing); Deborah Jones Merritt, *The Guarantee Clause and State Autonomy: Federalism for a Third Century*, 88 Colum L Rev 1, 70-78 (1988) (same); Edward A. Stelzer, *Bearing the Judicial Mantel: State Court Enforcement of the Guarantee Clause*, 68 NYU L Rev 870, 895-900 (1993) (same); Hans A. Linde, *When Is Initiative Lawmaking Not "Republican Government"?*, 17 Hastings Const LQ 159, 160-63 (1989) (stating that, although the United States Supreme Court's approach "allocates federal responsibility for the guarantee within the branches of the federal government, * * * it does not relieve the states of the obligation to maintain republican forms of government"). *Cf.* Akhil R. Amar, *The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem*, 65 Univ of Colo L Rev 749, 756 & nn 26 & 27 (1994) (criticizing Linde's "anti-direct democracy" approach toward the Guarantee Clause).

republican form of government." *Id.* at 185. In reaching that conclusion, the Court wrote:

> "[R]ecently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions. Contemporary commentators have likewise suggested that courts should address the merits of such claims, at least in some circumstances." *Ibid.* (citation omitted).

Obviously, that passage means that at some future date, "at least in some circumstances," some Guarantee Clause claims may raise justiciable controversies. However, in *New York*, the Court did not hold that any Guarantee Clause claim is justiciable. In addition, in *New York*, the issue arose in the context of whether a *state* could invoke the Guarantee Clause as a basis for limiting federal intrusion into state autonomy. The Court has shown no inclination to allow individual litigants to rely on the Guarantee Clause to challenge a state action on the basis that that action infringes on federal constitutional rights. We will not fail to follow the applicable holding in *Pacific Telephone* because of a factually distinguishable *dictum* contained in *New York*.

Vanzant's claim under the Guarantee Clause is not justiciable.

## B. *Equal Protection*

Defendant's final argument is that he was right for the right reason: that ORS 137.700 violates the Equal Protection Clause of the United States Constitution. The Fourteenth Amendment provides in part:

> "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." US Const, Amend XIV, § 1.

In deciding this case, defendant ruled that

> "the same identical sentence mandated by the statute may constitute cruel and inhuman punishment in one fact situation and an appropriate sentence in another. * * * If the application as to one defendant is unconstitutional, it would necessarily be unconstitutional to all within the class as a denial of equal protection of the laws."

In this court, defendant further contends:

> "Measure 11 prohibits trial courts from imposing prison sentences of less than the measure's prescribed terms. Because of that, an offender such as defendant Vanzant, whose Measure 11 minimum is greater than the presumptive maximum sentence he would get under the guidelines, has no meaningful way to seek a mitigated sentence."

Based on that premise, defendant asserts that ORS 137.700 is subject to "strict scrutiny"[23] under federal law, for two reasons: First, because the voters adopted Measure 11 at the same time as a companion, Measure 10, which amended the state constitution to change the means by which Measure 11 can be amended in the future; and, second, because Measure 11 violates "fundamental rights against cruel and unusual punishments, and of allocution."

Measure 10 (1994) enacted Article IV, section 33, of the Oregon Constitution. It provides in part that "a two-thirds vote of all the members elected to each house shall be necessary to pass a bill that reduces a criminal sentence approved by the people."

Whatever the meaning or merits of Measure 10, it is not at issue in this proceeding. Measure 10 and Measure 11 operate independently. Neither was dependent on the other for enactment.

We conclude, therefore, that the existence of Measure 10 does not require strict scrutiny of Measure 11. We need not and do not decide whether Measure 10 itself would be subject to strict scrutiny.

Defendant's second argument for strict scrutiny rests on the assertion that convicted persons have a "fundamental right" to be free from the infliction of cruel and unusual punishment and to allocute. With respect to cruel and unusual punishment, the pertinent precedent is *Chapman v.*

---

[23] In *Harper v. Virginia Bd. of Elections*, 383 US 663, 670, 86 S Ct 1079, 16 L Ed 2d 169 (1966), the Supreme Court held that, "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." The Court later explained what "strict scrutiny" entails: The challenged law must be "necessary to promote a compelling state interest." *Kramer v. Union School District*, 395 US 621, 627, 89 S Ct 1886, 23 L Ed 2d 583 (1969).

*United States*, 500 US 453, 111 S Ct 1919, 114 L Ed 2d 524 (1991). In that case, the Court rejected an argument that a provision of the federal sentencing guidelines, providing for mandatory minimum sentences for drug crimes, should be subjected to strict scrutiny because the statute implicated fundamental rights. 500 US at 464-65. The Court instead utilized a "rational basis" test and upheld the statute. *Id.* at 465.

With respect to the assertion that the federal right of allocution is a "fundamental right" that calls for strict scrutiny, we have explained, earlier in this opinion, why ORS 137.700 does not infringe the right of allocution.[24] Because the statute does not infringe the right of allocution, the purportedly "fundamental" nature of that right does not affect the Equal Protection analysis.

■ We conclude that the applicable federal law calls for use of the rational-basis test. Defendant argues in the alternative that ORS 137.700 does not survive the rational-basis test:

> "[T]he measure purports to serve four purposes: incapacitation, deterrence, sentence predictability, and sentence comparability. The first two purposes are legitimate, but the measure is not rationally related to them. The latter two purposes are illegitimate. The measure does not bear a rational relation to some legitimate end. Defendant judge correctly ruled that it violates equal protection."

Defendant's first assertion plainly is incorrect. An imprisoned felon is incapacitated from committing further crimes in society at large during the term of incarceration.

With respect to the second assertion, defendant cites many sources for the proposition that imprisonment is an ineffective deterrent. His policy point may be debatable, but

---

[24] *See generally Hill v. United States*, 368 US 424, 428, 82 S Ct 468, 7 L Ed 2d 417 (1962). There, the Court held that the failure to allow an opportunity for allocution was not cognizable in *habeas corpus*, because "[i]t is an error which is neither jurisdictional *nor constitutional*." (Emphasis added.) The Supreme Court left open the question whether a *refusal* to permit allocution upon request would entitle a petitioner to *habeas corpus* relief. *Id.* at 429. But the mere absence of an opportunity for allocution was not of constitutional magnitude, as the absence of a "fundamental" right would be.

it is legislatively debatable, and the people (acting in their legislative role) have chosen against him. Moreover, his argument proves too much. If ORS 137.700 is not rationally related to the goal of deterrence simply because prison does not work, then no statute prescribing incarceration would survive even the rational-basis test.

Defendant also asserts that a "non-selective" incarceration system is even less effective in controlling crime than is a more individualized system. However, under the rational-basis test, a statute need not "employ the least restrictive, or even the most effective or wisest, means to achieve its legitimate ends." *Jones v. Helms*, 452 US 412, 425-26, 101 S Ct 2434, 69 L Ed 2d 118 (1981).

The third argument is that predictability in sentencing cannot be a legitimate end of this statute, because ORS 137.700 arbitrarily selects only certain felonies for mandatory minimum sentences. The statute is, however, directed toward violent offenses. Each covered crime involves either the unlawful use of force against a person or a serious sexual assault on a child who is incapable of consenting. Even if the statute is "underinclusive," because it does not list all violent felonies, the Supreme Court ordinarily does not strike down criminal laws on that ground under the rational-basis test used for Equal Protection analysis. *Id.* at 426.

Defendant's fourth point is that the goal of achieving comparable sentences for those who commit comparable crimes is not a legitimate end. He contends that the law thereby disadvantages judges who would prefer to impose lesser sentences. But ORS 137.700 classifies, and singles out for specified treatment, certain convicted felons, not certain judges. It is the classification among convicted persons that must be examined.

As to that classification, laws subject to rational-basis scrutiny will be upheld "so long as [the classification] bears a rational relation to some legitimate end." *Romer v. Evans*, ___ US ___ , 116 S Ct 1620, 1627, 134 L Ed 2d 855 (1996). A law may be so overinclusive or underinclusive that no rational relationship can be detected. 116 S Ct at 1627-28.

That is not the situation here. ORS 137.700 prescribes mandatory minimum sentences for most violent felonies committed against people. In view of the penalties already prescribed by law for other violent felonies, the selection reflected in ORS 137.700 is rationally related to a legitimate end.

Finally, we note that the Equal Protection Clause does not prevent a state from increasing the punishment actually imposed for a particular crime. For example, in *Dobbert v. Florida*, 432 US 282, 97 S Ct 2290, 53 L Ed 2d 344 (1977), the defendant, who had killed his children, was sentenced to death under a Florida statute that was enacted in 1972 and that later was held to be constitutional. An earlier version of the statute had been held to be unconstitutional. As a result, the sentences of all those sentenced to death under the former statute were commuted to life imprisonment. 432 US at 301. The Supreme Court held, among other things, that the imposition of a death sentence on the defendant did not deny him equal protection merely because all convicted persons who had been sentenced to death under the old statute had been resentenced to life imprisonment. *Ibid.*

We conclude that ORS 137.700 survives defendant's Equal Protection challenge.

## IV. CONCLUSION

None of the facial constitutional challenges mounted in this case is well taken. For that reason, defendant erred as a matter of law when he refused to apply ORS 137.700 when sentencing Vanzant. We direct the issuance of a peremptory writ of mandamus, requiring defendant to enter a corrected judgment in *State v. Bobby Ron Vanzant*, Jackson County Case No. 952538CC2, that imposes sentence for the crime of second-degree manslaughter in accordance with ORS 137.700(2)(e).

Peremptory writ to issue.

**DURHAM, J.,** concurring in part and dissenting in part.

I agree with the majority that, in this case, mandamus is an appropriate procedural mechanism for obtaining judicial review of relator's (and, necessarily, the state's) claims of error regarding the sentencing of Vanzant. Relator has no plainly available remedy in the ordinary course of law but not for the reason relied on by the majority. In response to the parties' arguments on the merits, the majority refuses to address Vanzant's claim under the Guarantee Clause of Article IV, section 4, of the United States Constitution, asserting that that claim is "not justiciable." 324 Or at 618. For the reasons discussed below, I believe that the majority's determination regarding justiciability is flawed. Accordingly, I dissent from that portion of the majority's opinion.

### 1. Mandamus is an Available Remedy.

ORS 34.110 provides:

"A writ of mandamus may be issued to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station; but though the writ may require such court, corporation, board, officer or person to exercise judgment, or proceed to the discharge of any functions, it shall not control judicial discretion. *The writ shall not be issued in any case where there is a plain, speedy and adequate remedy in the ordinary course of the law.*" (Emphasis added.)

Relator contends that defendant judge erred in sentencing Vanzant. Relator claims that defendant judge should have sentenced Vanzant under Ballot Measure 11, ORS 137.700(2)(e), and should not have entered a presumptive sentence pursuant to the rules of the Oregon Criminal Justice Commission, ORS 137.637. Defendant judge decided that a presumptive sentence was appropriate because Ballot Measure 11, ORS 137.700(2)(e), was unconstitutional. 324 Or at 600. The question that arises is whether relator's remedy for that ruling by way of an appeal under ORS 138.060 and 138.222 is a "plain, speedy and adequate remedy" under ORS 34.110.

The majority answers that question by holding that the state has no right under ORS 138.222 to obtain appellate review of defendant judge's ruling that Ballot Measure 11 is unconstitutional. I doubt that the legislature intended to deny the state the ability to obtain appellate review of an issue of that kind. However, it is unnecessary to decide finally in this case that the state has no right to appeal that issue. Sufficient doubt surrounds the question of the review-ability of that constitutional issue that an appeal is not a legal remedy that is *plainly* available to relator. As a consequence, ORS 34.110 imposes no barrier to consideration of relator's claim through a writ of mandamus.

Set forth below are the reasons why, in my view, ORS 138.222 does not plainly bar appellate review of the trial court's constitutional ruling. ORS 138.222 authorizes an appellate court to review certain issues on appeal and imposes limitations on such review. It provides in part:

"(2) On appeal from a judgment of conviction entered for a felony committed on or after November 1, 1989, the appellate court shall not review:

"(a) Any sentence that is within the presumptive sentence prescribed by the rules of the Oregon Criminal Justice Commission.

"(b) A sentence of probation when the rules of the Oregon Criminal Justice Commission prescribe a presumptive sentence of imprisonment but allow a sentence of probation without departure.

"(c) A sentence of imprisonment when the rules of the Oregon Criminal Justice Commission prescribe a presumptive sentence of imprisonment but allow a sentence of probation without departure.

"(d) Any sentence resulting from a stipulated sentencing agreement between the state and the defendant which the sentencing court approves on the record.

"(e) Except as authorized in subsections (3) and (4) of this section, any other issue related to sentencing.

"(3) In any appeal from a judgment of conviction imposing a sentence that departs from the presumptive sentence prescribed by the rules of the Oregon Criminal

Justice Commission, sentence review shall be limited to whether the sentencing court's findings of fact and reasons justifying a departure from the sentence prescribed by the rules of the Oregon Criminal Justice Commission:

"(a) Are supported by the evidence in the record; and

"(b) Constitute substantial and compelling reasons for departure.

"(4) In any appeal, the appellate court may review a claim that:

"(a) The sentencing court failed to comply with requirements of law in imposing or failing to impose a sentence[.]"

The first question is whether, by appealing, the state, represented here by relator, would seek "review" of a "sentence." In one sense, the answer is yes. Relator argues that, due to the defendant judge's error, Vanzant received a sentence of 20 months but should have received a minimum sentence of 75 months under Ballot Measure 11. However, contrary to the majority's view, that answer is not obvious. Seen differently, relator's claim also can be viewed as an attack on defendant judge's preliminary ruling that Ballot Measure 11 is unconstitutional and, for that reason, the sentencing scheme or procedure that controls how the ultimate sentencing decision should be made is the sentencing guidelines, not Ballot Measure 11. Under that view, the limitation on seeking "review" of a "sentence" would not prevent the state from claiming on appeal that the trial judge applied the wrong body of law to the sentencing decision. Nothing in the statutory text, context, or legislative history of paragraph (2)(a) cited by the majority supports its assertion that the legislature intended to foreclose the state from seeking review of asserted legal errors surrounding the global issue of the correct statutory scheme that should control sentencing decisions.

I turn to paragraph (4)(a). The text of that statute purports to authorize the appellate court to consider precisely the sort of claim that relator now asserts: that the sentencing court violated a legal requirement—here, Ballot Measure 11—in imposing or failing to impose a sentence.

According to that paragraph, the appellate court has that review authority "[i]n any appeal."

The majority contends that no such authority exists because of the statement by the court in *State v. Adams*, 315 Or 359, 365, 847 P2d 397 (1993), that "[t]he wording of the statute clearly demonstrates that ORS 138.222(3) and (4) are exceptions only to ORS 138.222(2)(e)." 324 Or at 608. For several reasons, I disagree with the majority's reliance on that sentence in *Adams* to foreclose the state's right to obtain appellate review here.

In *Adams*, the defendant stipulated to a sentence as part of a plea agreement, and received exactly the sentence—an upward departure sentence—to which he had stipulated. 315 Or at 363-64. Because he stipulated to his sentence, the defendant never made any objection or claim in the trial court that the court was required to cite substantial and compelling reasons justifying the departure. *Id.* at 364; *see* ORS 137.671 (requiring substantial and compelling reasons to justify a departure sentence). Nevertheless, he appealed and argued that the sentencing court violated a legal requirement by failing to cite reasons justifying the departure sentence.

A straightforward answer to that argument is that the defendant could not obtain appellate review of that claim because he had never raised it in the trial court and, in fact, had stipulated to the very judgment that he sought to appeal. The *Adams* majority took a different approach, choosing instead to interpret ORS 138.222(2)(d). The majority held that that paragraph barred appellate review of any sentence resulting from a stipulated sentencing agreement. 315 Or at 367. Although *Adams* reached the correct result, it has no application here.

*Adams* involved a stipulated sentence, unlike the case here. More importantly, the sentence from *Adams* quoted above, on which the majority relies, was a statement about the *text* of ORS 138.222(2)(e), not a conclusion reached after an analysis of "the text, context, and legislative history," as the majority now incorrectly states. 324 Or at 607.

The *Adams* majority examined the available legislative history behind the phrase "any other issue related to sentencing" in ORS 138.222(2)(e) and concluded that it "did not answer definitively the question before us." 315 Or at 366.

Despite the lack of definitive legislative history, the *Adams* majority quoted a statement by Senator Springer. He confirmed that his committee had " 'worked * * * to limit the circumstances in which an appeal may be taken,' " and he paraphrased the text of ORS 138.222(2)(d), saying that " 'the court will not review those sentences * * * if the sentence is resulting from an agreement between the state and the defendant[.]' " *Ibid.* That history is equally inconclusive regarding the meaning of ORS 138.222, yet the *Adams* majority relied on it to assert that the "[d]efendant's proposed reading of ORS 138.222 is not consistent with the purpose of the sentencing guidelines, as revealed in the legislative history." *Ibid.* That conclusion does not follow from the legislative material on which it is based.

The *Adams* majority noted that paragraph (2)(a) through (d) each barred appellate review of "any sentence" and that, using different terms, paragraph (e) barred review of *"any other issue* related to sentencing" *except* as authorized in subsections (3) and (4). *Id.* at 365 (emphasis added). The *Adams* majority acknowledged that "[w]e are not free to ignore the fact that the legislature used different terms in related portions of the statute," *ibid.*, and then proceeded to examine the statute without regard to those and other significant textual distinctions.

Two observations about *Adams* are apropos. In regard to its construction of paragraph (d), *Adams* exhibits a methodology of statutory interpretation that is flawed in several respects. The entire exercise in *Adams* probably was unnecessary because the defendant failed to preserve any of the issues raised on appeal. In regard to paragraph (e), *Adams* expressed, in one sentence, a conclusion about the appealability of legal issues related to a stipulated sentencing agreement, but it did so without interpreting the text of ORS 138.222 as a whole, without relying on any helpful legislative history and without estimating how the legislature might have approached the problem had it thought of the

question. For that reason, the majority overstates what *Adams* actually held, as opposed to what *Adams* said, without analysis, about an isolated phrase in the text.

In my view, significant text in ORS 138.222(2) was not interpreted in *Adams*. Paragraph (e) is an authorization of appellate review for the types of claims described in subsections (3) and (4). Subsection (3) describes issues that the appellate court "shall" review, and subsection (4) describes issues that the appellate court "may" review *in any appeal*. Subsections (3) and (4) are not "exceptions" to paragraph (e). Nothing in the statute supports *that* reading. Rather, subsections (3) and (4) are *authorizations* for appellate review that subsection (e) excepts from its ban on appellate review of "any other issue related to sentencing." Stated differently, subsections (3) and (4) refer to "other issue[s] related to sentencing" that the statute authorizes the appellate court to review.

The authorization for appellate review in subsection (4), as noted above, is discretionary, not mandatory. Had the *Adams* majority addressed the text of that subsection, it would have concluded that the Court of Appeals was permitted, but not required, to review the defendant's claim and that the court could consider the defendant's failure to preserve any issue in deciding whether to review his claim on appeal. Considering that procedural problem, I doubt that any appellate court would allow discretionary appellate review of unpreserved claims regarding a *stipulated* sentence.

The same cannot be said regarding the state's legal issue here. From the outset of litigation regarding Vanzant's sentence, the state has contended that Ballot Measure 11 is lawful in all respects and that Ballot Measure 11, not the sentencing guidelines, dictates Vanzant's sentence. In the words of ORS 138.222(2)(e), the constitutionality of Ballot Measure 11 is an "other issue related to sentencing" for which discretionary appellate review authority exists under ORS 138.222(4)(a). *Adams* appears not to foreclose the possibility of an appeal by the state on that issue. For present purposes, all that this court needs to say is that genuine uncertainty regarding the state's appellate remedies for defendant

judge's constitutional ruling justified plaintiff in filing a petition for a writ of mandamus.

ORS 34.110 authorizes issuance of a writ of mandamus unless a "plain, speedy and adequate" remedy in the ordinary course of law is available. *Webster's Third New Int'l Dictionary* (unabridged ed 1993) provides the following relevant definitions of those statutory terms:

> "plain * * *: in a plain manner: without obscurity or ambiguity: CLEARLY, SIMPLY * * *." *Id.* at 1729.

> "speedy * * * 1: rapid in motion: going or able to go quickly: SWIFT * * * 2: marked by swiftness of motion or action: occurring, accomplished, or arrived at quickly * * * 3: prompt in action or performance: QUICK * * *." *Id.* at 2190.

> "adequate * * * 2: equal to, proportionate to, or fully sufficient for a specified or implied requirement * * * 3: legally sufficient: such as is lawfully and reasonably sufficient * * *." *Id.* at 25.

I agree that an appellate remedy is "speedy" and "adequate," within those definitions, to afford the state relief from the trial court's asserted legal error. However, as discussed above, the existence of genuine uncertainty about whether the state legally was entitled to appeal regarding that asserted legal error means that an appeal was not a plainly available remedy in the ordinary course of law.[1]

The majority states that its interpretation in *Adams* became "a part of the statute as if written therein," citing *State v. King*, 316 Or 437, 445, 852 P2d 190 (1993), and that

---

[1] The law of equity observes a similar rule, barring equitable relief where a plain, speedy, and adequate remedy at law is available. *See Amer. Life Ins. Co. v. Stewart*, 300 US 203, 214, 57 S Ct 377, 380, 81 L Ed 2d 605 (1937), where the U. S. Supreme Court, in an analogous circumstance, said that an insurer could resort to equity where statements by courts in prior cases created a doubt about whether the insurer could obtain an adequate remedy at law:

> "At least in such warnings there are possibilities of danger which a cautious insurer would not put aside as visionary. *'Where equity can give relief plaintiff ought not be compelled to speculate upon the chance of his obtaining relief at law.' Davis v. Wakelee*, 156 US 680, 688[, 39 L Ed 578, 15 S Ct 555 (1895)]. * * * A remedy at law does not exclude one in equity unless it is equally prompt and certain and in other ways efficient." (Emphasis added.)

it is simply applying *Adams* "in a new factual setting." 324 Or at 608. That reasoning is problematic for two reasons.

First, this case involves a statute, ORS 138.222-(2)(a), regarding review of a presumptive sentence, and a legal issue—the state's opportunity to obtain appellate review of a preliminary constitutional ruling by the trial court—that *Adams* never addressed. Indeed, *Adams* left uninterpreted a good deal of the text of ORS 138.222(2) and all of the legislative history that bears on the state's right to appellate review here. Whether the state has a right to obtain appellate review here cannot be brushed aside as a mere factual variation of the claim in *Adams*.

Second, there is reason to doubt the accuracy of the majority's statement, borrowed from *King* and other cases, that a prior interpretation by this court becomes a part of the statute as if written into it by the legislature at the time of enactment. *See Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992) (stating rule of prior interpretation). This concern is separate from the question whether *Adams* constitutes a "prior interpretation" of the statute that controls the state's appellate remedies in this context.

My intention is to raise the question of the accuracy of the majority's statement regarding the perpetual effect of this court's prior interpretation of a statute, and not to decide the issue finally, because persuasive responses may support the "prior interpretation" rule cited by the majority. I raise the question because appellate courts on occasion present verbal formulas as "rules" without examining the assumptions that underlie them. Through repetition over time without genuine legal analysis, such formulas can become unsound law. In my view, this court never should be unwilling to reconsider the continuing validity of the premises that support court-made rules when credible questions about them arise.

According to recent scholarship, the rule of prior interpretation appears to have sprung up, without explanation or statutory authority, in an opinion of this court in 1955[2] that relied inaccurately on two out-of-state sources

---

[2] The decision in question, *State of Oregon v. Elliott*, 204 Or 460, 277 P2d 754 (1955), was handed down by this court in December 1954. This court denied

that, at best, bear little relationship to Oregon law. According to Judge Jack L. Landau, in his article, *Some Observations About Statutory Construction In Oregon*, 32 Willamette L Rev 1, 18 (1996),

"[t]he citations can be traced back to a 1955 case, *State of Oregon v. Elliott*[, 204 Or 460, 465, 277 P2d 754, *cert den* 349 US 929 (1955)], in which the court recited this rule and cited as authority a 1914 Missouri case and an article in *American Jurisprudence* [50 Am Jur *Statutes*, § 221 (1994)]. Interestingly, the *American Jurisprudence* article says: 'The interpretation of a statute by the highest courts of a state by which the statute was enacted, is generally regarded as an integral part of the statute, *at least* where the meaning of such statute is in issue in a court of another jurisdiction.' That is quite a different point than the one for which the court cited it.

"The important question, however, is not whether the court's rule of prior construction can be supported by prior authority. In fact, the rule is rooted fairly firmly in the formalist traditions of nineteenth-century 'vested rights' jurisprudence. The more important inquiry is whether the rule makes sense.

"Beyond bare references to prior cases, the supreme court has never explained the basis for the rule that its construction of statutes becomes part of the statutes themselves. The rule appears predicated on the fiction of legislative acquiescence. According to that notion, once the court interprets a statute, the legislature is put on constructive notice of the court's interpretation, and if the legislature fails to 'correct' that interpretation by subsequent enactment, the court may assume that the legislature acquiesces in the court's interpretation.

"This reasoning has at least two problems. First, it simply does not accord with reality. Legislatures may or may not be aware of the court's interpretations of statutes, particularly in a state such as Oregon, where a legislative assembly of ordinary citizens meets for approximately six months out of every twenty-four. It is unlikely that every

---

reconsideration without opinion in January 1955, and the United States Supreme Court denied a petition for certiorari in May 1955. The Oregon Reports, following the prevailing practice in that era, identified the case's year of decision as 1955 because that is the year in which the last decision occurred in any appellate court. The accurate year of decision in the case is 1954.

legislator subscribes to the Oregon Reports and keeps abreast of the supreme court's interpretations of the legislature's handiwork. Moreover, even assuming that legislators know what the supreme court is saying about their enactments, the legislature may not respond to the court's statutory construction cases for any number of reasons, none of which has anything to do with acquiescence in the court's interpretations.

"* * * * *

"Aside from the fact that the court's rule of prior construction lacks any real explanatory foundation, there is at least one significant problem in its application: If the court's construction becomes part of the statute, the court lacks authority to overrule its own decision. Thus, if the court mistakenly construes a statutory provision—whether because certain arguments were not considered or made to the court at the time, or related statutes were not brought to its attention, or relevant legislative history was not before it—there is nothing anyone but the legislature can do about it." (Footnotes omitted; emphasis in original.)

Judge Landau's last criticism of the rule raises another concern of mine. The rule of prior interpretation purports to announce a shorthand version of the well-established rule of *stare decisis*, at least with respect to statutory interpretations. *See State v. White*, 303 Or 333, 348, 736 P2d 552 (1987) (treating the rule of prior interpretation as an application, in the context of statutory interpretation, of the doctrine of *stare decisis*).

I accept and support the doctrine of *stare decisis* as adopted by this court. I believe, however, that the evolution of the rule of prior interpretation in this court's opinions has introduced a degree of inflexibility to our jurisprudence of statutory interpretation that is unfaithful to the doctrine of *stare decisis*.

*Safeway Stores v. State Bd. Agriculture*, 198 Or 43, 255 P2d 564 (1953), is helpful to this discussion because it accurately presents this court's doctrine of *stare decisis* and relies on the adaptability inherent in that doctrine in overturning an earlier interpretation of a statute by this court. The court explained the doctrine of *stare decisis* in these terms:

" 'The rule of stare decisis is not so imperative or inflexible as to preclude a departure therefrom in any case, but its application must be determined in each case by the discretion of the court, and previous decisions should not be followed to the extent that error may be perpetuated and grievous wrong be the result. Accordingly, unless a doctrine or principle has become so well established that it may fairly be considered to have become a rule of property, * * * the courts will not adhere to it, although established by previous decisions, if they are convinced that it is erroneous, even though it may have been reasserted and acquiesced in for a number of years, especially if the former decisions are injurious or unjust in their operation.' [21 CJS 322, Courts § 193.]

*"State v. Mellenberger,* 163 Or 233, 95 P2d 709, 128 ALR 1506, a criminal case, in departing from a precedent, quoted the following from Dr. Roscoe Pound:

" 'In the epigrammatic phrase of Mr. Justice Holmes, historical continuity is not a duty, it is only a necessity. It is not that we ought to hew to what our forbears have done in the past as a matter of duty. But we find ourselves starting where they left off, building upon what they did and using the materials they left to us. In law we have to perceive how and why legal institutions arose, and to what ends, and with newer and better perceived and better understood ends, to adapt the institutions and materials which have come down to us to the tasks of social control in the time and place. Our materials are experience by reason and testing reason by experience. "Every generation," says Sir Frederick Pollock, "takes up from its fathers, if it is worthy of them, a new starting point of imagination and aptitude, and the strange conservatism of the imaginative faculty is a sure warrant of continuity.'

"After that quotation, the Mellenberger decision took the following from an essay by Daniel H. Chamberlain:

" 'A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination, is an authority, or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases, where "the very point" is again in controversy; but the

degree of authority belonging to such a precedent depends, of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible.' " 198 Or at 80-81.

In *Safeway Stores*, the issue was whether a state agency possessed authority under an Oregon statute to deny a milk processing and distribution license for a reason other than those specified in the Oregon statute, known as the Milk Marketing Act. *Id.* at 64. The plaintiff contended that the statute confined the state agency to the grounds for denial stated in the statute. *Id.* at 52. The defendant contended, among other things, that the statutory list of grounds for denial was not exclusive, that his statutory authority to deny a license permitted him to rely on nonstatutory criteria, such as the adequacy of milk distribution service in the particular region, and that this court had adopted an interpretation of the statute that supported the defendant's position in a recent case, *State ex rel Peterson v. Martin*, 180 Or 459, 176 P2d 636 (1947). *Safeway Stores*, 198 Or at 77.

In *Martin*, the issue was whether the Milk Marketing Act vested the administrator of the Department of Agriculture with discretion to refuse to issue or to revoke a milk distributor's license in the absence of a violation of a specific statutory ground for revocation. 180 Or at 467. The court held that the statute afforded the administrator general discretion to deny a license for the reason that existing service was adequate and that the statute did not require, in addition, a specific ground for license revocation. *Id.* at 473.

The court in *Safeway Stores* reviewed the statutory analysis conducted just six years earlier in *Martin*, and concluded that that analysis did "lend countenance" to the defendant's argument. 198 Or at 80. However, the court said that those statements were "not within the doctrine of stare decisis" and "are not beyond subsequent re-examination." *Ibid.* The court, after reviewing the doctrine of *stare decisis*, concluded that its statements in *Martin* regarding the administrator's statutory authority were "unsound" and "must be deemed withdrawn." *Id.* at 82.

The doctrine of *stare decisis* operates most commonly in regard to proposed modifications of the common law. *Safeway Stores* illustrates that the doctrine equally is applicable to proposed modifications of prior judicial interpretations of statutes. Moreover, the two central premises of the doctrine of *stare decisis*—stability and flexibility—continue to serve important roles in this court's case law regarding statutory interpretation notwithstanding the rule of prior interpretation. As Judge Landau demonstrates, this court in *Holcomb v. Sunderland*, 321 Or 99, 894 P2d 457 (1995), sidestepped the rule of prior interpretation when it revisited a statute that it previously had construed, concluded that new facts altered the premises for the prior construction, and adopted a different statutory construction. 32 Willamette L Rev at 20-23. Despite the lack of an intervening alteration of the statute in question, the court changed its statutory construction because the prior interpretation no longer reflected reality. *Holcomb*, 321 Or at 105-06.

*Safeway Stores* and *Holcomb* are not isolated examples of this court's willingness to overrule earlier statutory interpretations when it desires to do so. In *Carlson v. Blumenstein*, 293 Or 494, 501 n 5, 651 P2d 710 (1982), the court overruled two prior decisions[3] that, according to the court, erroneously interpreted ORS 17.055 to create a right to recover attorney fees in some circumstances. The court did not hesitate to overrule those incorrect cases because of the rule of prior interpretation. Yet, the legislature had not altered the text of the statutes that the court had interpreted in those cases. Those inconsistencies in the application of the rule of prior interpretation suggest that the court may cite that "rule" as a convenient reason to adhere to prior interpretation when the court desires to do so but that the "rule" is not an impediment to a reexamination and alteration of a prior judicial interpretation of a statute when the court prefers that outcome.

In my view, the rule of prior interpretation fairly is open to scrutiny, particularly on the question whether it has introduced needless and harmful rigidity into this court's

---

[3] *Carlson* overruled *Webster v. General Motors Accept.*, 267 Or 304, 516 P2d 1275 (1973), and *Wetzstein v. Hemstreet*, 276 Or 623, 555 P2d 1243 (1976).

methodology of statutory construction. Judicial interpretations of statutes that control many areas of commerce, such as those that concern real property, should not be reconsidered, except in the narrowest of circumstances, in order to serve the public's strong need for stability in commercial transactions. However, the justification for any judicial disinclination to modify prior statutory interpretations can be less weighty in other contexts, such as statutory regulation of the authority of governmental bodies and officers and procedures related to operation of the courts. In those areas of law, and perhaps others, if new legal research and advocacy can demonstrate that a prior statutory interpretation was inaccurate and now is causing injustice, the court's proper role under the doctrine of *stare decisis* is to modify its former statutory interpretation and adopt a new, correct interpretation that is consonant with the legislature's intention.

Advocates who may wish to raise questions regarding the rule of prior interpretation before this court should recognize that some members of the court—not this member—may expect argument about whether the court's statements in *G. L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 59, 757 P2d 1347 (1988) (stating "three premises" for reconsideration of a nonstatutory rule or doctrine), impose a barrier to modification of the rule of prior interpretation. Cautious counsel should not neglect adequate treatment of those premises in briefing and argument.

For the reasons expressed above, I agree that this matter is properly before the court on a petition for a writ of mandamus.

## 2. Republican Form of Government Clause.

Article IV, section 4, of the United States Constitution, provides in part that

> "[t]he United States shall guarantee to every State in this Union a Republican Form of Government * * *."

That provision is part of the constitutional law—the supreme law of this land—that every Oregon judge swears to uphold upon taking office. Nevertheless, several rulings of the United States Supreme Court have stunted the development of any appreciable jurisprudence regarding the enforce-

ability of that clause, at least in state courts. For example, in *Pacific Telephone Co. v. Oregon*, 223 US 118, 151, 32 S Ct 224, 56 L Ed 377 (1912), the Court held that federal enforcement of the clause was a responsibility of Congress, not the federal courts. Although *Pacific Telephone* purports to decide only the justiciability of the clause in federal, not state, courts, some (although not all) state courts have refused to consider cases arising under the clause on the theory that decisions like *Pacific Telephone* also preclude state court litigation. *Cf. Van Sickle v. Shanahan*, 212 Kan 426, 511 P2d 223 (1973) (examining a Kansas constitutional amendment under the Guarantee Clause) *with State v. Mountain Timber Co.*, 75 Wash 581, 590, 135 P 645 (1913), *aff'd* 243 US 219, 37 S Ct 260, 61 L Ed 685 (1917), and *Cochran v. Louisiana State Board of Education*, 168 La 1030, 1032-33, 123 So 664 (1928), *aff'd* 281 US 370, 50 S Ct 335, 74 L Ed 913 (1930) (each case holding that the Guarantee Clause dispute was not justiciable; result affirmed by United States Supreme Court). The majority reads the latter cases to say that state courts *cannot* exercise their judicial power over Guarantee Clause disputes. I disagree.[4]

State courts possess general authority to decide, under state law, that a particular dispute is not a justiciable controversy that the courts of the state will resolve through the exercise of their judicial power. A host of factors may influence a state court to reach such a conclusion, including opinions of the United States Supreme Court about the justiciability of Guarantee Clause claims in *federal* courts. Consequently, when the state courts of Washington and Louisiana in *Mountain Timber* and *Cochran* treated the claims before them as "nonjusticiable," the decisions constituted determinations under state law that the judicial power of those states did not extend to the resolution of those disputes.

Nothing in the Guarantee Clause or any other law *compels* a state court to entertain Guarantee Clause litigation if it elects not to do so, whether on grounds of nonjusticiability or some other ground. Properly viewed, the Supreme

---

[4] I address the justiciability aspect of defendant judge's Guarantee Clause argument because that argument offers an alternative basis for sustaining the judgment below. In dissenting from the majority's justiciability ruling, I make no comment regarding defendant judge's other alternative arguments, under state and federal law, offered to sustain the judgment.

Court's affirmances in *Mountain Timber* and *Cochran* determine only that the Guarantee Clause does not *compel* any state to treat such a claim as a justiciable controversy. Neither state court violated any federal law by deciding not to address Guarantee Clause claims. I do not read those decisions to say that a state court possesses no authority to entertain a Guarantee Clause claim that is otherwise justiciable if it chooses to do so. That question, which concerns the scope of every state's judicial power, was neither addressed nor decided finally in those cases.

Also undecided, under existing United States Supreme Court cases, is the precise character of the duty of each state, and the interplay of that duty with that of the federal government, under the Guarantee Clause. The majority does not address the justiciability of the alleged violation of *Oregon's* duty under that clause. In *Minor v. Happersett*, 88 US (21 Wall) 162, 175, 22 L Ed 627 (1874), the Supreme Court stated:

> "The guaranty necessarily implies a duty on the part of the States themselves to provide such a government."

Taking that statement at face value, as we must, we can only conclude that Oregon is duty-bound, under the Guarantee Clause, to provide a government that is republican in form. That state duty is distinct from the other duty, expressed in the clause, compelling the federal government to guarantee a republican form of government to every state. None of the authorities relied on by the majority addresses the justiciability in Oregon's state courts of a controversy arising from *Oregon's* independent duty, expressed in *Minor*, under the Guarantee Clause. Moreover, that issue is distinct from the still unresolved question whether a state court can decide, under the Guarantee Clause, whether state lawmaking violates any aspect of the federal government's duty to assure a republican government in every state.

To be sure, *Minor v. Happersett* predated *Pacific Telephone* by several decades. However, *Pacific Telephone* involved only an invocation of the federal government's duty to guarantee a republican government in the states and did not address or analyze the justiciability in state court of a state's duty under Article IV, section 4. Moreover, whatever

the strength of the logic underlying *Pacific Telephone*—that only Congress may create rules with respect to the federal government's Guarantee Clause obligation to the states—that logic is not easily applied in the context of one state's violation of its duty under that clause by the enactment of a statute by initiative. If Oregon enacts a single statute or state constitutional provision in a manner that offends Oregon's obligation under the principles of republican government, it is virtually inconceivable that Congress will respond with federal legislation to correct that sort of problem. In my view, the majority overreads *Pacific Telephone* to preclude litigation in state courts at least with respect to Oregon's obligation under Article IV, section 4.

The precise nature of Oregon's obligation under the republican Guarantee Clause is not crystal clear. We know less about what governmental forms and methods always are republican than those that we know clearly are not. For example, James Madison distinguished republicanism—policymaking achieved through the deliberation of representative lawmakers—from direct democracy and rejected the latter. He said in *The Federalist No. 10*, at 133 (James Madison) (B. F. Wright, ed 1961):

"From this view of the subject it may be concluded that a pure democracy, by which I mean a society consisting of a small number of citizens, who assemble and administer the government in person, can admit of no cure for the mischiefs of faction. A common passion or interest will, in almost every case, be felt by a majority of the whole; a communication and concert result from the form of government itself; and there is nothing to check the inducements to sacrifice the weaker party or an obnoxious individual. Hence it is that such democracies have ever been spectacles of turbulence and contention; have ever been found incompatible with personal security or the rights of property; and have in general been as short in their lives as they have been violent in their deaths. Theoretic politicians, who have patronized this species of government, have erroneously supposed that by reducing mankind to a perfect equality in their political rights, they would, at the same time, be perfectly equalized and assimilated in their possessions, their opinions, and their passions.

"A republic, by which I mean a government in which the scheme of representation takes place, opens a different prospect, and promises the cure for which we are seeking. * * *

"The two great points of difference between a democracy and a republic are: first, the delegation of the government, in the latter, to a small number of citizens elected by the rest; secondly, the greater number of citizens, and greater sphere of country, over which the latter may be extended.

"The effect of the first difference is, on the one hand, to refine and enlarge the public views, by passing them through the medium of a chosen body of citizens, whose wisdom may best discern the true interest of their country, and whose patriotism and love of justice will be least likely to sacrifice it to temporary or partial considerations. Under such a regulation, it may well happen that the public voice, pronounced by the representatives of the people, will be more consonant to the public good than if pronounced by the people themselves, convened for the purpose. On the other hand, the effect may be inverted. Men of factious tempers, of local prejudices, or of sinister designs, may, by intrigue, by corruption, or by other means, first obtain the suffrages, and then betray the interests, of the people. The question resulting is, whether small or extensive republics are more favorable to the election of proper guardians of the public weal; and it is clearly decided in favor of the latter by two obvious considerations:

"* * * * *

"The other point of difference is, the greater number of citizens and extent of territory which may be brought within the compass of republican than democratic government; and it is this circumstance principally which renders factious combinations less to be dreaded in the former than in the latter. The smaller the society, the fewer probably will be the distinct parties and interests composing it; the fewer the distinct parties and interests, the more frequently will a majority be found of the same party; and the smaller the number of individuals composing a majority, and the smaller the compass within which they are placed, the most easily will they concert and execute their plans of oppression. Extend the sphere, and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to

invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength, and to act in unison with each other. Besides other impediments, it may be remarked that, where there is a consciousness of unjust or dishonorable purposes, communication is always checked by distrust in proportion to the number who concurrence is necessary."

In *The Federalist No. 14*, at 150 (James Madison) (B. F. Wright, ed 1961), Madison underscored his preference for a republican form of government, rather than a direct democracy, over the large territory occupied by the Union:

"The error which limits republican government to a narrow district has been unfolded and refuted in preceding papers. I remark here only that it seems to owe its rise and prevalence chiefly to the confounding of a republic with a democracy, applying to the former reasonings drawn from the nature of the latter. The true distinction between these forms was also adverted to on a former occasion. It is, that in a democracy, the people meet and exercise the government in person; in a republic, they assemble and administer it by their representatives and agents. A democracy, consequently, will be confined to a small spot. A republic may be extended over a large region."

In *The Federalist No. 39*, at 282 (James Madison) (B. F. Wright, ed 1961), Madison attempts to make the case that the government proposed in the new constitution is republican in form, rather than a direct democracy, by emphasizing that the President, members of Congress, and, indirectly, federal judges, derive their governmental powers directly or indirectly from the people, and adds:

"Could any further proof be required of the republican complexion of this system, the most decisive one might be found in its absolute prohibition of titles of nobility, both under the federal and the State governments; and in its express guaranty of the republican form to each of the latter."

The point of those passages was summarized by the United States Supreme Court in *In re Duncan*, 139 US 449, 461, 11 S Ct 573, 35 L Ed 219 (1891):

"By the Constitution, a republican form of government is guaranteed to every State in the Union, and the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies whose legitimate acts may be said to be those of the people themselves; but, while the people are thus the source of political power, their governments, National and State, have been limited by written constitutions, and they have themselves thereby set bounds to their own power, as against the sudden impulses of mere majorities."

Justice Hans A. Linde, formerly of this court has drawn attention to the above-quoted passage from *Duncan* and the importance of deliberative lawmaking by the people's representatives as an institutional protection, long predating the Fourteenth Amendment, against the oppression of political minorities:

"To its architects, republican government thus depended on deliberation by representative institutions not only for rational public policies; it also was the essential safeguard of civil and religious rights. The Guaranty Clause must be understood in a context without a nationwide bill of rights or judicial review. The Constitution contained very few rights against state lawmaking; republican processes were supposed to prevent majoritarian as well as autocratic abuse. The Guaranty Clause did not change meaning because the Fourteenth Amendment ninety years later created a new task for federal courts. The United States Supreme Court understood this when, a few years before Oregon adopted the initiative process, it linked the guarantee of republican government with protections against *'the sudden impulses of mere majorities.'* " Hans A. Linde, *When Initiative Lawmaking Is Not "Republican Government": The Campaign Against Homosexuality*, 72 Or L Rev 19, 33 (1993) (emphasis added).

*See also* Catherine A. Rogers and David L. Faigman, *"And To The Republic For Which It Stands": Guaranteeing a Republican Form of Government*, 23 Hastings Const LQ 1057 (1996); Hans A. Linde, *Who is Responsible For Republican Government?*, 65 Colo L Rev 709, 728 (1994) (arguing that state officials have a responsibility to govern by republican means, and that state courts, bound by the federal constitution as the

supreme law of the land, are not free to shift to other political branches the resolution of claims under the Guarantee Clause); Hans A. Linde, *When Is Initiative Lawmaking Not "Republican Government"?*, 17 Hastings Const LQ 159 (1989).

It is by no means certain that the manner of lawmaking observed by Oregon in respect to the enactment of Ballot Measure 11 violates the republican guarantee. It is a statute adopted through the initiative, and it controls certain sentencing decisions by state court judges. As a legislative direction that confines the authority of a state officer, its subject matter may pass muster despite the absence of either deliberation by representative lawmakers or the opportunity for a gubernatorial veto during the enactment process.

However, the enactment of Ballot Measure 11 occurred at the same time as the enactment of Ballot Measure 10, Oregon Constitution, Article IV, section 33, which provides:

> "Notwithstanding the provisions of section 25 of this Article, a two-thirds vote of all the members elected to each house shall be necessary to pass a bill that reduces a criminal sentence approved by the people under section 1 of this Article."

The effect of Ballot Measure 10 is also uncertain, but it appears to preclude a legislative alteration of Ballot Measure 11 except by the supermajority voting margin described in its text. The effect of that requirement on the question of the compliance of Ballot Measure 11 with the Guarantee Clause similarly is uncertain. However, the correct answer to these important questions is not to treat them as nonjusticiable. Even if Vanzant is able to establish a Guarantee Clause violation, the result of that determination is debatable. The articles by Justice Linde and Ms. Rogers and Professor Faigman, cited above, sharply disagree regarding the proper resolution of a Guarantee Clause challenge to the result of initiative lawmaking. All of those questions deserve further focused briefing by the parties and perhaps further oral argument.

The majority's nonjusticiability determination sweeps those issues out of this court unanswered. Fortunately, the United States Supreme Court may be prepared to reconsider its previous conflicting statements about the justiciability of Guarantee Clause claims. *See New York v. United States*, 505 US 144, 184-85, 112 S Ct 2408, 120 L Ed 2d 120 (1992), in which the Court *assumed* that the Guarantee Clause dispute before it was justiciable, and cited *Reynolds v. Sims*, 377 US 533, 582, 84 S Ct 1362, 12 L Ed 2d 506 (1964) ("*some* questions raised under the Guarantee Clause are nonjusticiable") (emphasis added), and several scholarly writings that urge the courts to address the merits of Guarantee Clause claims, at least in some circumstances. *Pacific Telephone, Cochran*, and *Mountain Timber*, on which the majority relies most heavily, predate *Reynolds*, yet the majority takes the view, in contrast to *Reynolds*, that *all* Guarantee Clause claims are nonjusticiable.

As *New York* demonstrates, litigants who seek to enforce the *federal government's* Guarantee Clause obligation in state or federal court face a body of case law regarding justiciability that is less than clear and consistent. The Supreme Court cannot long continue to assume but not decide the justiciability of Guarantee Clause claims without further exacerbating the problem. However, setting aside that distinct question, the Court's cases do not direct state appellate courts to treat as nonjusticiable a claim that, in violation of the Guarantee Clause, a *state government* has breached its own duty to enact its laws by the process that is the very definition of republican government: deliberative decisionmaking by the people's chosen representatives. This court must address that question in order to decide whether the term of imprisonment for which relator advocates would violate the supreme law of the land. Unlike the United States Supreme Court, we have no authority to withhold a judicial decision and tender the issue to Congress for a political resolution.

To the many state courts that presently are considering, in concrete cases, a host of Guarantee Clause challenges to initiated laws adopted without the protection of deliberation by representative legislative bodies, the Court's

allusion in *New York* that it may clarify its position on justiciability comes as welcome news. However, in regard to the particular claims asserted here, I do not agree that the Court's *existing* case law imposes the barrier of nonjusticiability at the door of this court.

For the reasons discussed above, I concur in part and dissent in part.

Fadeley, J., joins in part 2 of this opinion.

**FADELEY, J.,** dissenting in part.

I dissent in part and do so by joining only the dissenting portion of Justice Durham's separate opinion.